## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-CIV-80123-RAR

**MARIA MAGDALENA**
**ALVAREZ GALVEZ,** *et al.*,

      Plaintiffs,

v.

**FANJUL CORPORATION,** *et al.*,

      Defendants.

_____/

### <u>ORDER GRANTING MOTION TO DISMISS</u>

In the early morning of January 26, 2016, Central Romana—a sugar company based in the Dominican Republic—allegedly launched two "military-style incursions" to forcibly evict Plaintiffs from their homes in the Villa Guerrero neighborhood of El Seibo, a province in the eastern Dominican Republic.  Insisting that the Dominican courts are "notoriously corrupt" and that Central Romana is the alter-ego of Florida company Fanjul Corp., Plaintiffs sued in this Court alleging violations of Dominican law and international human rights law, as well as several common law torts.  Plaintiffs contend that this Court has jurisdiction under the Alien Tort Statute and federal question jurisdiction despite the extraterritorial nature of the events at issue in this case.

Currently before the Court is Defendants' Motion to Dismiss [ECF No. 31] ("Motion"), filed on September 9, 2020, which seeks dismissal of this action for lack of subject matter jurisdiction and on *forum non conveniens* grounds, among other reasons.  Plaintiffs filed a response to the Motion on October 21, 2020 [ECF No. 39] ("Response") and Defendants filed their reply on November 9, 2020 [ECF No. 43].  On January 10, 2021, Plaintiffs filed a motion to supplement their Response [ECF No. 47] ("Motion to Supplement"), which Defendants opposed [ECF No.

48].  The Court having reviewed the parties' written submissions, the record, and the applicable law, and being otherwise fully advised, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss [ECF No. 31] is GRANTED and Plaintiffs' Motion to Supplement [ECF No. 47] is DENIED AS MOOT for the reasons set forth herein.

## BACKGROUND

Plaintiffs allege that on January 26, 2016, while the Dominican Republic was celebrating a national holiday in honor of one of its founding fathers, Juan Pablo Duarte, Central Romana sent heavily armed agents to forcibly remove Plaintiffs and their families from their homes in Villa Guerrero.  *See* Compl. [ECF No. 1] ¶ 36.  According to the Complaint, Central Romana evicted over 60 families and destroyed their homes and personal property.  *See id.*  In some instances, Plaintiffs or their family members were still inside the homes at the time they were destroyed and sustained physical injuries.  *Id.* ¶ 38.  Plaintiffs allege violations of the Dominican Republic Constitution, the American Convention on Human Rights, the International Covenant on Civil and Political Rights (ICCPR), and the Dominican Civil Code.  *Id.*, Counts I-IV, at 15-19.  They also plead assault, battery, false imprisonment, forcible entry and detainer, and intentional infliction of emotional distress.  *Id.*, Counts V-IX, at 19-22.

A significant portion of Plaintiffs' Complaint is devoted to describing the purported "sugar empire" of which Defendants are a part.  *Id.* at 7-12.  Plaintiffs indicate that the sugar empire is headed by Fanjul—a Florida corporation with its principal place of business in West Palm Beach—and includes fourteen entities.  *Id.* ¶¶ 25, 41.  One of those entities is Central Romana, which is incorporated under the laws of the British Virgin Islands and has its principal place of business in the Dominican Republic.  *Id.* ¶¶ 26, 41.  Plaintiffs assert that Fanjul Corp. owns 35% of Central

Romana's shares through a subsidiary, Agro-Industrial Management, Inc., and that Fanjul and Central Romana have four overlapping officers and directors. *Id.* ¶¶ 41-42.

The Complaint avers that this Court has subject matter jurisdiction over Plaintiffs' international law and Dominican law claims under the Alien Tort Statute, 28 U.S.C. section 1350 ("ATS"), and under 28 U.S.C. section 1331 (federal question jurisdiction)—and that the Court can therefore also exercise supplemental jurisdiction over the state law claims. *Id.* ¶ 27. Plaintiffs further assert that the Dominican Republic is not an adequate forum for this case because "[t]he Dominican courts are notoriously corrupt" and Fanjul "wields outsized influence" as the country's largest landowner, employer, and sugar producer. *Id.* ¶¶ 47-48. Plaintiffs acknowledge that "[e]vidence concerning the specifics of military-style operations mounted by the Central Romana force principally is located in the Dominican Republic," but maintain that Florida-based Fanjul likely possesses some of the evidence concerning the decision-making that led to the forcible evictions. *Id.* ¶¶ 49-50. Plaintiffs allege that relevant witnesses are located in both the Dominican Republic and the United States, *id.* ¶ 49, and that it will not be an "onerous burden" for this Court to obtain an expert to provide guidance on applying Dominican law. *Id.* ¶ 50.

In the Motion, Defendants seek dismissal of the Complaint on four grounds. First, Defendants maintain that the Court lacks subject matter jurisdiction under the ATS because the statute does not apply to torts committed extraterritorially. *See* Mot. at 2-3. Defendants also contend that Plaintiffs improperly allege federal question jurisdiction without pleading a cause of action arising under the Constitution, laws, or treaties of the United States. *Id.* at 3. Second, Defendants assert that the Court does not have personal jurisdiction over Central Romana. *Id.* at 3-6. Third, Defendants argue that Plaintiffs fail as a matter of law to allege any basis on which to hold Fanjul liable for the alleged conduct of Central Romana. *Id.* at 7-11. Finally, Defendants

contend that this Court should decline to exercise jurisdiction over this action under the doctrine of *forum non conveniens*.

In their Response, Plaintiffs maintain that the facts alleged in the Complaint "touch and concern" the United States with sufficient force to overcome the presumption against extraterritorial application of the ATS.  *See* Resp. at 3-4.  Specifically, Plaintiffs insist that their allegations that Fanjul is Central Romana's alter-ego, a U.S. citizen, and likely participated in decisions that led to Plaintiffs' evictions are enough to overcome the presumption.  *Id.*  Plaintiffs seek leave to amend the Complaint to more clearly allege Fanjul's involvement in the decisions that violated "Plaintiffs' right to judicial process and due process," *id.* at 4, n.1, and to assert alienage jurisdiction under 28 U.S.C. section 1332(a)(2).  *Id.* at 2.  Plaintiffs also reiterate the arguments raised in their Complaint for why the Dominican Republic is an inadequate forum for this dispute.  *Id.* at 15-20.  Additionally, Plaintiffs seek leave to conduct limited discovery to establish the Court's personal jurisdiction over Central Romana and support their alter-ego theory. *Id.* at 8.[1]

Further, in an effort to demonstrate Central Romana's contacts with Florida for personal jurisdiction purposes, Plaintiffs subsequently moved to supplement their Response with a document showing sugar shipments Central Romana made to the United States.  *See* Mot. to Supplement, Ex. 2 [ECF No. 47-2].

## ANALYSIS

For the reasons set forth below, the Court finds that it lacks subject matter jurisdiction over this action.  The Court further finds that Plaintiffs have inadequately alleged that Central Romana

---

[1]  On November 13, 2020, the Court stayed discovery in this case pending resolution of this Motion.  *See* Paperless Order [ECF No. 45].

is Fanjul's alter-ego.  Amendment of Plaintiffs' Complaint as to the ATS would be futile, but the Court will nevertheless grant Plaintiffs leave to amend their Complaint to the extent they are able to assert an alternative ground for subject matter jurisdiction.  Moreover, given that Plaintiffs may only be able to establish subject matter jurisdiction by dropping Central Romana as a party, the Court finds it unnecessary at this juncture to reach Defendants' *forum non conveniens* arguments[2] or the question of whether the Court has personal jurisdiction over Central Romana.

## I.  Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction and "possess only that power authorized by Constitution and statute, . . . which is not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted).  It is presumed that an action lies outside this limited jurisdiction and the party asserting jurisdiction bears the burden of establishing the contrary.  *Id.*  Because a federal court is "powerless to act beyond its statutory grant of subject matter jurisdiction," the court must "zealously insure that jurisdiction exists over a case . . . ."  *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may challenge subject matter jurisdiction either facially or factually.  *See McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).  A facial attack requires the Court to merely look at the complaint to see if the plaintiff has sufficiently alleged a basis for subject matter jurisdiction,

---

[2]  To establish the availability of the Dominican Republic as an alternative forum, Defendants are required to show that all Defendants are subject to the jurisdiction of the Dominican courts.  *See In re W. Caribbean Crew Members*, No. 07-22015, 2008 WL 11331752, at \*4 (S.D. Fla. Oct. 1, 2008) ("The moving defendant must establish that an adequate and available forum exists as to all defendants if there are several."); *Rodriguez v. Ocean Motion Watersports, Ltd.*, No. 13-21606, 2014 WL 11880982, at \*3 (S.D. Fla. Mar. 11, 2014).  In a supplement to their Motion, Defendants clarified that Fanjul "does not consent to the jurisdiction of the courts in the Dominican Republic."  Defendant Fanjul Corp.'s Supplement to the Motion to Dismiss [ECF No. 52].  Thus, consideration of *forum non conveniens* is only warranted if Fanjul is dismissed as a defendant and Central Romana remains in the case.

and the allegations in the complaint are accepted as true for purposes of the motion to dismiss. *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). A factual attack, on the other hand, challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* (citation omitted).

Although Defendants submit two declarations with their Motion [ECF Nos. 31-1 and 31-2], the declarations focus on challenging the Court's personal jurisdiction over Central Romana and establishing that dismissal based on *forum non conveniens* is warranted. Because Defendants contest the Court's subject matter jurisdiction solely by reference to the allegations in Plaintiffs' Complaint, the Court construes Defendants' attack on subject matter jurisdiction to be a facial one.

As mentioned above, Plaintiffs' Complaint asserts two bases for subject matter jurisdiction—jurisdiction under the ATS and federal question jurisdiction under section 1331. In their Response, Plaintiffs maintain that the Court has jurisdiction under the ATS but appear to abandon their assertion of federal question jurisdiction, instead seeking leave to plead alienage jurisdiction as an alternative to the ATS. *See* Resp. at 2. For the sake of thoroughness, the Court analyzes the three jurisdictional grounds advanced by Plaintiffs and, as explained below, finds that Plaintiffs have failed to establish subject matter jurisdiction under all three.

    **a. Alien Tort Statute**

       ***i. Background on the ATS***

In an oft-quoted characterization, Judge Friendly referred to the ATS as "a kind of legal Lohengrin"—like the mysterious knight in Richard Wagner's opera, "no one seems to know whence it came." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975). The ATS was enacted as part of the Judiciary Act of 1789 and provides that "[t]he district courts shall have original

jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1396-97 (2018) (quoting 28 U.S.C. § 1350). The purpose and history of the ATS has been analyzed at length by the Supreme Court and need not be reiterated in detail here, except to note that "[t]he principal objective of the statute, when first enacted, was to avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." *Id.* at 1397. The ATS remained largely dormant for nearly 200 years and reemerged in the late twentieth century, when courts began to provide some redress to plaintiffs under the ATS for "violations of international human-rights protections that are clear and unambiguous." *Id.*

Since then, the Supreme Court has issued several key decisions clarifying the scope of the ATS that are pertinent here. First, in *Sosa v. Alvarez-Machain*, the Court explained that the ATS is a strictly jurisdictional statute that did not establish new causes of action for violations of international law. 542 U.S. 692, 724 (2004). The Court also found, however, that "Congress did not intend the ATS to sit on the shelf until some future time when it might enact further legislation." *Id.* Rather, the first Congress intended the ATS to provide a remedy for a limited category of international law violations recognized under the common law as it existed in 1789— namely, acts of piracy, injury to ambassadors, and violations of obligations of safe conduct. *Id.* The Court further held that in narrow circumstances, courts may recognize new causes of action under the ATS if the claim "rest[s] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized." *Id.* at 725. But the Court was quite explicit that federal courts should maintain "vigilant doorkeeping" and exercise "great caution" when considering new causes of action. *Id.*

at 128-129; *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246-47 (11th Cir. 2005).

Then, in *Kiobel v. Royal Dutch Petroleum Co.*, the Court held that an ATS claim may not reach conduct occurring exclusively in the territory of a foreign sovereign.  569 U.S. 108, 124 (2013).  The Court relied on the canon of statutory interpretation known as the presumption against extraterritorial application, which provides that "when a statute gives no clear indication of an extraterritorial application, it has none."    *Id.* at 115 (quotation and alteration omitted). Emphasizing concerns over the separation of powers and intrusion on the political branches' monopoly over foreign policy, the Court found that this presumption applies to the ATS and nothing in the text of the ATS rebuts it.  *Id.* at 124.  The Court then added that "even where the [ATS] claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application," and "mere corporate presence" in the United States does not suffice.  *Id.* at 125.

Finally, in *Jesner*, the Court resolved a question that it expressly left open in *Kiobel*: can foreign corporations ever be proper defendants under the ATS?  The Court concluded that they cannot.  *Jesner*, 138 S. Ct. at 1403.  As in *Kiobel*, the Court rested its decision on separation of powers and foreign affairs concerns, reasoning that Congress is in a better position to weigh the foreign policy implications of imposing ATS liability on foreign corporations.[3]  *See id.*  Although the Court granted certiorari to hear *Jesner* on the broader question of whether *any* corporation is subject to ATS liability, the Court limited its holding to foreign corporations.  *See Al Shimari v.*

---

[3]  The Court noted that "[i]n light of the foreign-policy and separation-of-powers concerns inherent in ATS litigation, there is an argument that a proper application of *Sosa* would preclude courts from ever recognizing any new causes of action under the ATS."  *Id.*  However, the Court stopped short of adopting that narrower application of *Sosa*, finding it unnecessary to resolve *Jesner*.  *Id.*

*CACI Premier Tech., Inc.*, 320 F. Supp. 3d 781, 783 (E.D. Va. 2018).   Whether domestic corporations are similarly immune from ATS liability is an issue presently pending before the Supreme Court.   *See Doe v. Nestle, S.A.*, 929 F.3d 623 (9th Cir. 2019), cert. granted sub nom. *Cargill, Inc. v. Doe I*, 141 S. Ct. 184 (2020), and cert. granted sub nom. *Nestle USA, Inc. v. Doe I*, 141 S. Ct. 188 (2020).

### ii.   Plaintiffs' Failure to Establish Subject Matter Jurisdiction Under the ATS

With these principles in mind, the Court finds that Plaintiffs have failed to establish subject matter jurisdiction under the ATS.   For starters, the Court agrees with Defendants that Plaintiffs have pleaded insufficient facts that "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application."   *Kiobel*, 569 U.S. at 125.   Plaintiffs' sole allegations connecting Central Romana's forcible evictions to the United States are that: (i) "decisions concerning whether and why to assemble the Central Romana force and to forcibly evict the Plaintiffs . . . likely were made in part by Fanjul employees in Florida"; and (ii) Fanjul is a U.S. citizen and Central Romana is its alter ego.   *See* Compl. ¶¶ 25, 32, 50; *see also* Resp. at 3-4.   These allegations are not enough to overcome the presumption against extraterritorial application of the ATS.

In cases applying the *Kiobel*'s touch and concern test, the Eleventh Circuit has made clear that "claims will only displace the presumption against extraterritoriality if enough of the relevant conduct occurs domestically and if the allegations of domestic conduct are supported by a minimum factual predicate."   *Doe v. Drummond Co.*, 782 F.3d 576, 598 (11th Cir. 2015) ("*Doe*"). For example, in *Baloco v. Drummond Co.*, the children of former union leaders who were murdered in Colombia brought an ATS lawsuit against an Alabama-based coal mining company, Drummond Company, Inc.  767 F.3d 1229, 1233 (11th Cir. 2014).  The *Baloco* plaintiffs alleged

that the murders were committed by paramilitaries of the AUC, an organization affiliated with Colombia's military that provided security against guerilla attacks for Drummond's coal mining facility and operations. *Id.* They contended that Drummond aided and abetted or conspired with the AUC by directly funding some of its operations and that it collaborated with the AUC to commit the assassinations of the union leaders. *Id.* The Complaint in *Baloco* alleged that Drummond officials "attended meetings in Colombia in 2000–2001 where there were discussions of paying the AUC to commit the murders and where money allegedly was paid," as well as "a meeting in which an AUC leader congratulated AUC members for carrying out the murders . . . ." *Id.* at 1236.

The Eleventh Circuit found that although the conduct by the Drummond officials, if true, was "extremely disturbing," "the allegations in the First Amended Complaint . . . fall short of the minimum factual predicate warranting the extraterritorial application of the ATS." *Id.* The Court reasoned that "the extrajudicial killings and war crimes asserted in the First Amended Complaint occurred in Colombia" and the fact that the Drummond entities were U.S. nationals did not carry significant weight. *Id.* The Court further noted that the plaintiffs failed "to allege any facts supporting a purported express agreement between Defendants and the AUC" to carry out the assassinations and found that "mere consent to support the AUC does not necessarily suggest any conduct in the United States directed at the murders of the union leaders . . . ." *Id.*

In *Doe*, which involved similar allegations, the Eleventh Circuit provided further guidance on the application of *Kiobel*'s touch and concern test. The *Doe* plaintiffs sued Drummond and others on behalf of over one hundred Colombian citizens killed by violent paramilitaries. 782 F.3d at 579. They averred that Drummond engaged the paramilitaries to eliminate suspected guerilla groups from around the company's mining operations in Colombia, and that the innocent

decedents were incidental casualties of Defendants' arrangement with the AUC. *Id*. The Court held that in ATS cases with an extraterritorial component, displacement of the presumption against extraterritorial application is "warranted if the claims have a U.S. focus and adequate relevant conduct occurs within the United States." *Id.* at 592. The Court explained that in this "fact-intensive inquiry," the site of the relevant conduct alleged carries significant weight—and other relevant factors include the U.S. citizenship of the defendants, the U.S. interests implicated by plaintiffs' claims, and the U.S. conduct alleged. *Id.* at 592, 594-600.

The Court concluded, however, that the *Doe* plaintiffs' general allegations that defendants had made funding and policy decisions in the United States were insufficient to displace the presumption where "the agreements between Defendants and the perpetrators of the killings, the planning and execution of the extrajudicial killings and war crimes, the collaboration by Defendants' employees with the AUC, and the actual funding of the AUC all took place in Colombia." *Id.* at 598. The Court emphasized that claims will only displace the presumption "if enough of the relevant conduct occurs domestically and if the allegations of domestic conduct are supported by a minimum factual predicate" and found that "[p]laintiffs' allegations of domestic conduct and connections are not particularly extensive or specific." *Id.*

So too here. The only allegation in Plaintiffs' Complaint that so much as alludes to any conduct within the United States is Plaintiffs' assertion that "decisions concerning whether and why to assemble the Central Romana force and to forcibly evict the Plaintiffs … likely were made in part by Fanjul employees in Florida." Compl. ¶ 50. Allowing Plaintiffs' claims to proceed on such "a speculative assertion of domestic conduct would run counter to *Kiobel*'s requirement that claims must touch and concern [the United States] with 'sufficient force.'" *Doe*, 782 F.3d at 588 (citing *Mujica v. AirScan Inc.*, 771 F.3d 580, 591-92 (9th Cir. 2014)); *see also Jara v. Nunez*, 878

F.3d 1268, 1273 (11th Cir. 2018) (reiterating the requirement articulated in *Doe* that allegations of relevant domestic conduct must be "extensive" and "specific."). All of the non-speculative allegations in Plaintiffs' Complaint relate to conduct that occurred in the Dominican Republic— *i.e.*, Central Romana's forcible evictions of Plaintiffs, the destruction of Plaintiffs' homes, the physical and emotional injuries Plaintiffs experienced, Central Romana's detention of Plaintiffs, and so on. And although Fanjul's U.S. citizenship is relevant to the touch and concern test, it does not alone displace the presumption against extraterritoriality. *Doe*, 782 F.3d at 600.[4] If the defendants' U.S. citizenship did not carry the day in *Baloco* and *Doe*—where the allegations of U.S. conduct were at least slightly more detailed than they are in this action—it is certainly not enough to displace the presumption here.[5]

Although Defendants' challenge to ATS subject matter jurisdiction focuses solely on the extraterritorial nature of the conduct in this case, Plaintiffs' invocation of the ATS poses two additional and arguably deeper problems. First, as discussed above, the Supreme Court has foreclosed lawsuits against foreign corporations under the ATS. *Jesner*, 138 S. Ct. at 1403. Thus, because Central Romana is a British Virgin Islands corporation with its principal place of business in the Dominican Republic, it is not an appropriate ATS defendant.

---

[4] The Court notes that in finding that U.S. citizenship is a relevant factor, the Eleventh Circuit reasoned that the risk of international discord—fundamental to the extraterritoriality concerns expressed in *Kiobel*— is substantially reduced when the defendant is a U.S. citizen because the plaintiff in such a case "would not be haling foreign nationals into U.S. courts to defend themselves." *Id.* at 595. Here, given that the second defendant Central Romana is a foreign corporation, the Court is particularly mindful of the foreign policy concerns raised in *Kiobel*.

[5] Nor does Plaintiffs' alter-ego theory change this conclusion. Even if the Court were to find that Central Romana is Fanjul's alter-ego, the circumstances would be the same: allegations of conduct occurring entirely in the Dominican Republic coupled with mere conjecture regarding decision-making in the United States.

Second, although the Court certainly does not condone the conduct alleged in the Complaint, it sees no basis to recognize a cause of action under the ATS for the acts Plaintiffs have alleged.  Plaintiffs assert that Defendants—who are non-state actors—"planned, organized and implemented the forcible eviction operations without a valid court order and without affording the Plaintiffs the right to judicial process and due process to which they were entitled under generally accepted norms of international law."  Compl. ¶ 64.  Plaintiffs contend that the American Convention on Human Rights[6] and the ICCPR "confirm the right to judicial process and due process."  *Id.* ¶ 63.  They quote, for example, the following language from Article 8.1 of the American Convention on Human Rights:

> Every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law, in the substantiation of any accusation of a criminal nature made against him or for the determination of his rights and obligations of a civil, labor, fiscal, or any other nature.

*Id.* ¶ 59.  They also quote Article 14.1 of the ICCPR, which provides that "[a]ll persons shall be equal before the courts and tribunals" and "[i]n the determination of any criminal charge against him, or of his rights and obligations in any suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law."  *Id.* ¶ 61.  Plaintiffs insist that Defendants' violations of their right to judicial and due process are actionable under the ATS.  *Id.* ¶ 65.

---

[6] Plaintiffs refer to the convention as the "Inter-American Convention on Human Rights."  Based on the language quoted from Article 8.1 of the Convention, the Court presumes that Plaintiffs are referring to the American Convention on Human Rights, carried out by the Inter-American Commission on Human Rights and the Inter-American Court of Human Rights.  *See* American Convention on Human Rights, Articles 8, 33, *available at* https://www.cidh.oas.org/basicos/english/basic3.american%20convention.htm (last visited April 12, 2021).

Before considering a cause of action under the ATS, the Court must apply the two-part test announced in *Sosa*. *See Jesner*, 138 S. Ct. at 1399. The Court must first ask whether Plaintiffs can demonstrate that the alleged violation is a norm that is "specific, universal, and obligatory." *Id.* (quoting *Sosa*, 542 U.S. at 732). Then, even if there is a specific norm under international law that is controlling, the Court must determine whether allowing the case to proceed under the ATS is a proper exercise of judicial discretion, "or instead whether caution requires the political branches to grant specific authority before corporate liability can be imposed." *Id.*

In *Estate of Amergi ex rel. Amergi v. Palestinian Authority*, the Eleventh Circuit described several characteristics that "may suggest that a norm falls within the narrow sphere of the ATS":

> For one, the existence of a treaty reflecting an overwhelming international consensus on certain norms may be evidence of the specificity and international scope of concern required by the ATS . . . Moreover, state action, or complicity therewith, may also be a powerful indicia of a violation that is sufficiently definite to support a cause of action under the ATS.

611 F.3d 1350, 1357 (11th Cir. 2010). The *Amergi* suit arose from the murder of an Israeli citizen who was shot and killed as she drove her car through the Gaza strip. *Id.* at 1353. Plaintiffs alleged that the decedent was killed in the course of an armed conflict between the defendants and the state of Israel and that the district court therefore had subject matter jurisdiction under the ATS. *Id.* at 1358. The Eleventh Circuit affirmed the district court's dismissal of the case for lack of subject matter jurisdiction, finding that "a single killing by non-state actors purportedly in the course of an armed conflict" failed to satisfy the ATS's high bar. *Id.* at 1353. The Court recognized that "[s]ome acts, such as torture and murder committed in the course of war crimes, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual," but found that the plaintiffs had not alleged any war crimes independent

of the single attack on the decedent.  *Id.* at 1361 (quoting *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1266-67 (11th Cir. 2009)).

Other cases similarly suggest that in the absence of state action, the ATS typically only imposes liability on private parties for violations of the most serious international norms, such as war crimes, slave trading, and genocide.  *See Romero v. Drummond Co.*, 552 F.3d 1303, 1316 (11th Cir. 2008) ("Under the Alien Tort Statute, state actors are the main objects of the law of nations, but individuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation."); *Aldana*, 416 F.3d at 1247 ("State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the Alien Tort Act."); *Kadic v. Karadzic*, 70 F.3d 232, 241-44 (2d Cir.1995) (holding that private individuals may be held liable under the ATS for genocide and war crimes but not torture or summary execution); *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 22 (D.D.C. 2000), aff'd sub nom. *Bao v. Li*, 35 F. App'x 1 (D.C. Cir. 2002) (noting that "[t]he cases recognizing an [ATS] cause of action against private individuals or corporations have done so in the context of the most egregious kinds of human rights violations," such as genocide, war crimes, and systematic killing and rape).

Here, Plaintiffs' expressed theory of ATS liability is essentially that Defendants, which are private actors, deprived Plaintiffs of the "judicial process and due process to which they were entitled under generally accepted norms of international law."  Compl. ¶ 64.  Given that courts have sharply circumscribed ATS liability for private actors to the most heinous violations of international norms, the Court finds that Plaintiffs' generalized allegations of "due process" violations by private corporations are not actionable under the ATS.  And even setting aside Plaintiffs' articulated theory of ATS liability—which centers on due process violations—and

focusing more broadly on the conduct alleged in the Complaint, the Court does not see a basis for recognizing a cause of action under the ATS. Plaintiffs' allegations focus on assault, battery, false imprisonment, and intentional infliction of emotional distress occurring in the course of forced evictions at the hands of private actors. The Court has not located any authority suggesting that forced evictions by private parties are actionable under the ATS—and is highly reluctant to create such a cause of action considering that courts have not recognized ATS liability for more serious conduct like torture and murder in the absence of state involvement. Nor do Plaintiffs have a viable ATS claim based on their allegations of assault, battery, false imprisonment, and intentional infliction of emotional distress. *See Saleh v. Titan Corp.*, 580 F.3d 1, 15 (D.C. Cir. 2009) (finding that plaintiff's claim that assault and battery violates a settled consensus of international law is "an untenable, even absurd, articulation of a supposed consensus of international law."); *Sosa*, 542 U.S. at 738 (holding that jurisdiction would not lie under the ATS for a "single illegal detention of less than a day"); *Aldana*, 416 F.3d at 1247 (finding no basis in law to recognize plaintiffs' claim for "arbitrary detention").

The treaties Plaintiffs cite in support of their ATS claim do not compel a different result. As mentioned above, when applying the *Sosa* test, courts are urged to consider international treaty obligations governing the conduct at issue. However, here, Plaintiffs rely on general provisions in the ICCPR and the American Convention on Human Rights relating to the right to a fair trial and equality before the courts. In *Aldana*, the Eleventh Circuit held that jurisdiction would not lie under the ATS for plaintiffs' claims of "cruel, inhuman, degrading treatment or punishment" where plaintiffs alleged that a security force hired by the defendant's subsidiary in Guatemala held plaintiffs hostage, threatened to kill them, shoved them with guns, and forced them at gunpoint to denounce their union activity and resign. 416 F.3d at 1245. The Eleventh Circuit reasoned that

district courts that had permitted such causes of action had relied on the ICCPR but that, as the Supreme Court explained in *Sosa*, the ICCPR did not "create obligations enforceable in the courts" because it was not self-executing.[7]  *Id.* at 1247 (quoting *Sosa*, 542 U.S. at 736); *see also Sairras v. Schleffer*, No. 07-23295, 2009 WL 10708747, at *3 (S.D. Fla. Sept. 21, 2009).  Likewise, the American Convention on Human Rights has been signed but not ratified by the United States, and therefore does create binding obligations in United States courts.  *See Garza v. Lappin*, 253 F.3d 918, 925 (7th Cir. 2001); *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 258 (2d Cir. 2003); *Mitchell v. United States*, No. 01-CR-01062, 2020 WL 4940909, at *5 (D. Ariz. Aug. 22, 2020); *see also* American Convention on Human Rights, General Information of the Treaty: B-32, *available at* https://www.oas.org/dil/treaties_b-32_american_convention_on_human_rights _sign.htm (last visited April 12, 2021).  Thus, Plaintiffs' reliance on these covenants and conventions does not support jurisdiction under the ATS.[8]

Even if Plaintiffs had identified a specific, controlling international law norm, allowing this case to proceed under the ATS without specific authority from the political branches would not be a prudent exercise of judicial discretion.  *See Jesner*, 138 S. Ct. at 1399.  Of course, freeing people from violence is an "ageless dream," *Amergi*, 611 F.3d at 1365 (quotation omitted), and the Court would hope that evictions—both domestically and abroad—are carried out as peacefully

---

[7]  Notably, the Eleventh Circuit also found the district court had appropriately dismissed the plaintiff's ATS claim based on "crimes against humanity."  *Id.*  The Court held that "to the extent that crimes against humanity are recognized as violations of international law, they occur as a result of 'widespread or systematic attack' against civilian populations."  *Id.* (quoting *Cabello v. Fernandez–Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005)).

[8]  Additionally, the Court notes that the provisions Plaintiffs cite from these documents appear to have little connection to the conduct described in the Complaint.  The cited provisions concern the right to a fair hearing and equality before judicial tribunals, but Plaintiffs factual allegations do not relate to attempts to avail themselves of judicial functions.

as possible.  But recognizing a cause of action under the ATS for forced evictions by private parties abroad in the absence of allegations of state involvement would have drastic practical consequences and run afoul of the vigilant gatekeeping role that *Sosa* contemplated for the courts.[9] For example, our courts would effectively be open to any alien who was injured in the course of an eviction by a private landlord on foreign territory, assuming the alien can plead sufficient U.S.-based conduct to satisfy the *Kiobel* touch-and-concern test.  The Court sympathizes with Plaintiffs' plight but finds it inappropriate to exercise the residual common law discretion it is afforded under *Sosa* in this dramatic fashion.

The Court thus finds that it lacks subject matter jurisdiction under the ATS because (i) Plaintiffs have not overcome the presumption against extraterritorial application of the statute; (ii) Plaintiffs do not have a viable ATS claim against Central Romana because it is a foreign corporation; and (iii) the acts alleged in Plaintiffs' Complaint are not actionable under the ATS.

**b.  Federal Question Jurisdiction Under 28 U.S.C. § 1331**

The Court now turns to whether it has subject matter jurisdiction under 28 U.S.C. section 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  Plaintiffs assert section 1331 as a basis for subject matter jurisdiction but do not explain how their action arises under the Constitution, laws, or treaties of the United States.  The Court assumes that Plaintiffs are invoking section 1331 based on their claim that Defendants violated the ICCPR and the American Convention on Human Rights.  However, "courts have . . . held consistently that only treaties with a specific provision permitting a private action, or one to be clearly inferred, may suffice as the

---

[9]  The Court need not analyze at this time whether jurisdiction would lie under the ATS for forced evictions at the hands of state actors or with state involvement.

basis for federal jurisdiction. Otherwise, no cause of action is stated and no federal law is applicable." *Honey Holdings I, Ltd. v. Alfred L. Wolff, Inc.*, 81 F. Supp. 3d 543, 551 (S.D. Tex. 2015) (quotations and alterations omitted); *see also Hanoch Tel-Oren v. Libyan Arab Republic*, 517 F. Supp. 542, 546 (D.D.C. 1981), aff'd sub nom. *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984).

Here, Plaintiffs do not have a privately enforceable claim under the ICCPR or the American Convention on Human Rights. The former was ratified with a declaration by Congress that the substantive provisions of the document were not self-executing and the latter has not been ratified by the United States. *See Sosa*, 542 U.S. at 735 (indicating that "[f]or any treaty to be susceptible to judicial enforcement it must both confer individual rights and be self-executing" and the ICCPR meets neither requirement); *Fernando v. Haekkerup*, No. 13-3176, 2013 WL 11318853, at *2 (E.D.N.Y. Sept. 23, 2013), aff'd, 596 F. App'x 40 (2d Cir. 2015) (finding plaintiff did not have a privately enforceable claim under the ICCPR or the UN Convention on the Rights of the Child, which had not been ratified); *Mitchell*, 2020 WL 4940909, at *5 ("An unratified treaty has no binding effect within the U.S."). Accordingly, these documents cannot serve as a basis for federal question jurisdiction.

### c.  Alienage Jurisdiction Under 28 U.S.C. § 1332(a)(2)

Although not alleged in the Complaint, Plaintiffs' Response raises alienage jurisdiction as an alternative ground for subject matter jurisdiction in this case. However, Plaintiffs' reliance on section 1332(a)(2) is also unavailing. Alienage jurisdiction is a form of diversity jurisdiction under which federal courts may hear cases between "citizens of a State and citizens or subjects of a foreign state." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1340 (11th Cir. 2011) (quoting 28 U.S.C. § 1332(a)(2)). Like general diversity under section 1332(a)(1), alienage

diversity must be complete—"an alien on both sides of a dispute will defeat jurisdiction." *Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1364 (11th Cir. 2018). Here, Plaintiffs are all citizens of the Dominican Republic and are suing Central Romana, which "is incorporated under the laws of the British Virgin Islands and has a principal place of business located in the Dominican Republic." Compl. ¶¶ 1-26. Because both Plaintiffs and Central Romana are aliens, section 1332(a)(2) does not support the exercise of jurisdiction in this case.

## II. Insufficiency of Alter-Ego and Agency Allegations

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quotation omitted); *Iqbal*, 556 U.S. at 678.

A parent company can be held liable for the acts of its subsidiaries in three ways: "(1) an alter ego theory to 'pierce the corporate veil;' (2) vicarious liability based on general agency principles; or (3) direct liability where the parent directly participated in the wrong complained of." *Salinero v. Johnson & Johnson*, No. 18-23643, 2019 WL 4585215, at *2 (S.D. Fla. Sept. 20, 2019). To establish a claim for piercing the corporate veil under Florida law, a plaintiff must allege that "(1) the shareholder dominated and controlled the corporation to such an extent that the

corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form [was] used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Molinos*, 633 F.3d at 1349 (quoting *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008)); *see also Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998). Because the veil-piercing elements under federal common law are substantially similar,[10] the Court need not engage in a choice of law analysis at this stage to determine whether Florida law or federal common law governs the alter ego analysis.

Plaintiffs allege that Fanjul is liable for the actions of Central Romana under agency and alter-ego theories because the companies are "interconnected and interrelated to such an extent that the acts of one are tantamount to the acts of the other." Compl. at 7. Specifically, Plaintiffs assert that Fanjul owns 35% of Central Romana's shares through a subsidiary, Agro-Industrial Management, Inc., and that Fanjul and Central Romana have four overlapping officers and directors. *Id.* ¶¶ 41-42. These allegations—which are buried among seemingly irrelevant facts

---

[10] The federal common law alter ego rule requires that three elements be proved in order to pierce the corporate veil:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*MCI Telecommunications Corp. v. O'Brien Mktg., Inc.*, 913 F. Supp. 1536, 1541 (S.D. Fla. 1995) (citing *United Steelworkers of America, AFL–CIO–CLC v. Connors Steel Co.*, 855 F.2d 1499, 1506 (11th Cir. 1988)).

relating to the other non-defendant entities that are part of the Fanjul's "sugar empire"—are insufficient to plead an alter ego theory. *See, e.g., First Auto. Serv. Corp., N.M. v. First Colonial Ins. Co.*, No. 07-00682, 2008 WL 816973, at \*6 (M.D. Fla. Mar. 25, 2008) ("Common ownership and common management, without more, are insufficient to override corporate separateness and pave the way for alter ego liability.") (quoting *Weiss Capital Management, Inc. v. Crowder*, 964 So. 2d 865, 866 (Fla. 4th DCA 2007)).  Plaintiffs do not allege how Fanjul controls or dominates Central Romana to such an extent that the Court should disregard the corporate entity.  Nor do Plaintiffs advance any allegations of improper or fraudulent use of the corporate form.

Plaintiffs have also alleged insufficient facts to support Fanjul's vicarious liability based on general agency principles.  Under Florida law, to hold a parent liable as the principal of a subsidiary-agent, Plaintiffs must establish: "(1) acknowledgement by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Salinero*, 2019 WL 4585215, at \*3 (quoting *State v. Am. Tobacco Co.*, 707 So. 2d 851, 854 (Fla. 4th DCA 1998)); *see also Brusherd v. Ford Motor Co.*, No. 08-513, 2009 WL 10670567, at \*4 (M.D. Fla. Sept. 18, 2009).  The parent corporation "must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Salinero*, 2019 WL 4585215, at \*3 (internal quotation marks omitted).  Similarly, under federal common law,

> the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

*In re S. Afr. Apartheid Litig.*, 633 F. Supp. 2d 117, 121 (S.D.N.Y. 2009) (quoting *Transamerica Leasing, Inc. v. Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000)).

Here, Plaintiffs' Complaint is devoid of allegations that would support these elements of acknowledgment, acceptance, or control.  All Plaintiffs assert to establish vicarious liability is common management between Fanjul and Central Romana and Fanjul's ownership of a minority of Central Romana's shares.  The Court therefore concludes that Plaintiffs have insufficiently alleged a basis to find Fanjul liable for the actions of Central Romana.

### III.  Plaintiffs' Request for Leave to Amend Complaint

As mentioned above, Plaintiffs request leave to amend the Complaint to more clearly plead that "[d]ecisions regarding why to forcibly evic[t] the Plaintiffs from their homes and the manner in which to do it, and similar decisions, were made by Fanjul in the United States."  Resp. at 3-4. They have also requested leave to amend to plead alienage jurisdiction.  *Id.* at 2.

Under Fed. R. Civ. P. 15(a)(2), leave to amend should be freely given "when justice so requires."  However, a Court may deny leave "if amendment would be futile."  *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020).  Leave to amend is futile "if an amended complaint would still fail at the motion-to-dismiss or summary-judgment stage."  *Id.* (citation omitted).  "In other words, the question is whether 'the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief.'"  *Id.* (quoting *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1262 (11th Cir. 2004)).

Because the Court finds that the acts alleged by Plaintiffs are not actionable under the ATS, granting Plaintiffs leave to amend their allegations of U.S. conduct to establish ATS jurisdiction would be futile.  Even if Plaintiffs were to better plead that Fanjul was involved in decisions about whether and how to evict the Plaintiffs, this would not bring Plaintiffs' claims within the scope of

the ATS. *See, e.g., Jara*, 878 F.3d at 1274 (finding that amendment of the complaint to replead ATS claim would be futile because amended complaint would not allege conduct focused in the United States to a degree necessary to overcome the presumption against extraterritoriality); *Haim v. Neeman*, No. 12-351, 2013 WL 12157279, at *4 (D.N.J. Jan. 23, 2013), aff'd sub nom. *Ben-Haim v. Neeman*, 543 F. App'x 152 (3d Cir. 2013) (finding that leave to amend would be futile where claims were not actionable under the ATS); *see also Nicholl v. Bd. of Regents of Univ. Sys. of Georgia*, 706 F. App'x 493, 499 (11th Cir. 2017) (finding that district court did not err by denying motion for leave to amend because plaintiff did not show that proposed amendment would have avoided dismissal). Nor would Plaintiffs' proposed amendment change the fact that based on the Supreme Court's holding in *Jesner*, Plaintiffs cannot bring an ATS claim against Central Romana, a foreign corporation. The Court therefore denies Plaintiffs' request to replead jurisdiction under the ATS.

However, although Plaintiffs' current Complaint does not support jurisdiction under section 1332(a)(2), it would not necessarily be futile to grant Plaintiffs leave to amend their Complaint to plead this basis for jurisdiction. For example, it is possible that Plaintiffs would drop Central Romana as a party to maintain alienage jurisdiction. *See Rivas v. The Bank of New York Mellon*, 676 F. App'x 926, 931 (11th Cir. 2017) (finding that district court erred when it denied leave to amend complaint because it was "distinctly possible that an amended complaint would allege that the parties are citizens of states other than the states of residence listed in the original complaint" or "would drop certain parties in an effort to maintain diversity jurisdiction.").

The Court still perceives several potential issues with Plaintiffs' case were they to amend the Complaint in this manner. For instance, the Court is doubtful that the state common law claims Plaintiffs assert, Counts V-IX, are viable based on the extraterritorial nature of the acts alleged in

the Complaint. *See In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 190 F. Supp. 3d 1100, 1112-13 (S.D. Fla. 2016). Further, it is likely that Central Romana is an indispensable party under Fed. R. Civ. P. 19 and therefore cannot be dropped from this action. Nevertheless, in an abundance of caution, and because these specific issues were not briefed by the parties in connection with this Motion, the Court will allow Plaintiffs to amend their Complaint to the extent they wish to assert a basis for jurisdiction other than the ATS.

To be clear, if Plaintiffs proceed with amending their Complaint, they shall not assert jurisdiction under the ATS or allege causes of action under the ICCPR and the American Convention on Human Rights for the reasons explained herein.

## **CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss [ECF No. 31] is **GRANTED** *without prejudice*.

2. If Plaintiffs wish to file an Amended Complaint in conformance with this Order, they shall do so on or before **May 3, 2021**.

3. Plaintiffs' Motion to Supplement [ECF No. 47] is **DENIED AS MOOT**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 12th day of April, 2021.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**